IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

UNITED STATES OF AMERICA,

     *Plaintiff*,

     v.

GALVESTON COUNTY, TEXAS;
GALVESTON COUNTY COMMISSIONERS
COURT; and MARK HENRY, in his capacity as
Galveston County Judge,

     *Defendants*.

Civil Action No.

## **COMPLAINT**

The United States of America, plaintiff herein, alleges:

1.     In this action, the United States challenges the Galveston County Commissioners Court redistricting plan, adopted on November 12, 2021, as a violation of Section 2 of the Voting Rights Act because it results in Black and Hispanic citizens not having an equal opportunity to participate in the political process and to elect their candidates of choice and was adopted, in part, for a discriminatory purpose.

2.     During the 2021 redistricting cycle, Defendants dismantled the commissioners court's sole, longstanding minority opportunity-to-elect district, *i.e.*, a district in which the County's minority citizens have an equal opportunity to elect their preferred candidates of choice.

3.     To do so, Defendants failed to adopt any redistricting criteria and deliberately excluded the commissioner elected from the sole minority opportunity-to-elect district from being meaningfully involved in the drawing of the 2021 plan.

4.      The County also limited public participation in the 2021 redistricting process.

5.      Resolving the malapportionment revealed by the release of the 2020 Census data did not require the County to redraw the commissioners court map in its entirety, nor did it require the County to dismantle the commissioners court's sole, longstanding district in which minority voters had an equal opportunity to elect candidates of choice.  In fact, Defendants could have reapportioned the commissioners court plan by shifting as little as a single voting precinct from Precinct 2 to Precinct 3.

6.      The County nonetheless made drastic changes to the district lines for the commissioners court, thereby eliminating the only majority-minority district.

7.      Over the course of the past three decades, Galveston County has sought to eliminate electoral opportunities for the County's Black and Hispanic voters.  The County has a long history of adopting discriminatory redistricting plans.

8.      While the State of Texas and its political subdivisions were subject to the requirements of Section 5 of the Voting Rights Act, the United States Attorney General twice interposed objections under Section 5 to the County's proposed redistricting plans because the County did not meet its burden of showing that the proposed plans had neither the purpose nor the effect of denying or abridging the right to vote for minority voters.  In 1992, the Attorney General interposed an objection against the County's proposed plan for justice of the peace and constable districts.  In 2012, the Attorney General interposed an objection against the County's proposed plans for commissioners court districts as well as for justice of the peace and constable districts.

9.     The Attorney General files this action pursuant to Sections 2 and 12(d) of the Voting Rights Act of 1965, as amended, 52 U.S.C. §§ 10301 and 10308(d), to enforce voting rights guaranteed by the Fourteenth and Fifteenth Amendments to the United States Constitution.

10.     For the reasons described below, this Court should declare that the 2021 commissioners court redistricting plan adopted by Defendants has both the result and intent of diluting the voting strength of the County's minority voters in violation of Section 2 of the Voting Rights Act, and permanently enjoin Defendants from administering, implementing, or conducting any future elections for the Galveston County Commissioners Court under this 2021 plan.

## JURISDICTION AND VENUE

11.     This Court has original jurisdiction of this action under 28 U.S.C. §§ 1331, 1345, and 2201(a) and 52 U.S.C. § 10308(f).

12.     Venue is proper in this Court under 28 U.S.C. §§ 124(b)(1) and 1391(b).

## PARTIES

13.     The Voting Rights Act authorizes the Attorney General to file a civil action on behalf of the United States of America seeking injunctive, preventive, and permanent relief for violations of Section 2 of the Voting Rights Act, 52 U.S.C. § 10308(d).

14.     Defendant Galveston County is a political and geographical subdivision of the State of Texas.  It is located in southeast Texas on the Gulf of Mexico and borders Harris, Brazoria, and Chambers Counties.

15.     Defendant Galveston County Commissioners Court is the County's governing body.  It consists of a county judge, elected at-large, who serves as the presiding officer, and four commissioners elected from single-member districts, called "precincts," to serve four-year,

staggered terms.  All members vote on all matters.  Both the county judge and the commissioners are elected in partisan elections with a majority-vote requirement in the party primary.

16.     Defendant Mark Henry is the County Judge of Galveston County and presiding officer of the Galveston County Commissioners Court.  Defendant Henry is being sued in his official capacity.  Defendant Henry has served as County Judge since 2010.

**ALLEGATIONS**

17.     According to the 2020 Census, Galveston County has a total population of 350,682 persons, of whom 191,358 (54.6%) are non-Hispanic White, 88,636 (25.3%) are Hispanic, and 45,637 (13%) are non-Hispanic Black.  The census data also indicated that the County has a total voting age population of 267,382, of whom 155,020 (58%) are non-Hispanic White, 60,159 (22.5%) are Hispanic, and 33,341 (12.5%) are non-Hispanic Black.

18.     According to the 2016-2020 American Community Survey (ACS) population estimates, Galveston County has a citizen voting age population of 239,305, of whom 151,450 (63.3%) are non-Hispanic White, 45,950 (19.2%) are Hispanic, and 30,510 (12.7%) are non-Hispanic Black.

19.     Exhibit 1 depicts the Galveston County commissioners court plan that was in effect from 2012 to 2021, and the tables below present the demographic data for the four commissioners court precincts in the 2012 plan, according to the 2020 Census and the 2016-2020 ACS estimates.

## Galveston County Commissioners Court (2012-2021)

| PCT. | TOTAL POPULATION | | | | DEV (%) | VOTING AGE POPULATION | | | |
|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | NHWHITE (%) | NHBLACK (%) | HISP (%) | | TOTAL | NHWHITE (%) | NHBLACK (%) | HISP (%) |
| 1 | 85,408 | 50,769 (59.4) | 6,491 (7.6) | 22,280 (26.1) | -2.58 | 65,748 | 41,774 (63.5) | 4,583 (7.0) | 14,934 (22.7) |
| 2 | 95,596 | 58,916 (61.6) | 8,608 (9.0) | 21,319 (22.3) | 9.04 | 73,739 | 47,895 (65.0) | 6,031 (8.2) | 14,634 (19.9) |
| 3 | 79,931 | 24,010 (30.0) | 25,143 (31.5) | 27,129 (33.9) | -8.83 | 61,278 | 20,755 (33.9) | 18,869 (30.8) | 18,741 (30.6) |
| 4 | 89,747 | 57,663 (64.3) | 5,395 (6.0) | 17,908 (20.0) | 2.37 | 66,617 | 44,596 (66.9) | 3,858 (5.8) | 11,850 (17.8) |

| PCT. | CITIZEN VOTING AGE POPULATION ESTIMATES | | | | |
|---|---|---|---|---|---|
| | TOTAL | NHWHITE (%) | NHBLACK (%) | HISP (%) | NHBLACK + HISP (%) |
| 1 | 61,465 | 41,428 (67.4) | 4,536 (7.4) | 11,798 (19.2) | 26.6 |
| 2 | 70,060 | 47,183 (67.4) | 5,897 (8.4) | 12,207 (17.4) | 25.8 |
| 3 | 56,182 | 20,455 (36.4) | 18,722 (33.3) | 13,819 (24.6) | 57.9 |
| 4 | 62,971 | 44,188 (70.2) | 3,705 (5.9) | 9,939 (15.8) | 21.7 |

20.     The four current commissioners are:  Darrell Apffel, who represents Precinct 1 and has served on the commissioners court since 2016; Joe Giusti, who represents Precinct 2 and has served on the commissioners court since 2014; Stephen Holmes, who represents Precinct 3 and has served on the commissioners court since 1999; and Kenneth Clark, who represents Precinct 4 and has served on the commissioners court since 1998.

21.     Commissioner Stephen Holmes, who is Black, is the sole minority member of the commissioners court and is elected from the only commissioners court precinct in which Black and Hispanic voters constitute a majority of the eligible voters.  He was appointed as the Precinct 3 commissioner following the death of the County's first Black commissioner, Wayne Johnson, who represented Precinct 3 from 1988 to 1999.

22.     The commissioners court is responsible for determining and approving the boundaries of the four precincts in the commissioners court.  Tex. Const. art. V §18 (a)-(b).  It is also responsible for redrawing the four justice of the peace and constable precincts, which are not coterminous with the commissioners court precincts.

23.     From 1975 through 2013, as a political subdivision of the State of Texas, Galveston County was covered under Section 4 of the Voting Rights Act and was required to comply with the preclearance requirements of Section 5 of the Voting Rights Act before implementing any change affecting voting.

24.     On March 17, 1992, the Attorney General interposed an objection under Section 5 to the County's submission of its 1991 redistricting plan for justice of the peace and constable districts.

25.     In 1992, private plaintiffs in *Hoskins v. Hannah*, 3:92-cv-12, ECF No. 61 (S.D. Tex. Aug. 19, 1992), obtained a consent judgment and order directing the County to create two justice of the peace and constable districts that "w[ould] create the opportunity for minority voters to participate in the political processes leading to the nomination and election of Justices of the Peace and Constables."

26.     On March 5, 2012, the Attorney General interposed an objection under Section 5 to the 2011 commissioners court redistricting plan as well as to the redistricting plan and the method of election for the justices of the peace and constables, which included a reduction in the number of justices of the peace and constables from eight to five.  Exhibit 2 is a copy of the letter informing County officials of that determination.

27.     With respect to the 2011 commissioners court redistricting plan, the Attorney General's March 5, 2012, letter stated that the County could not establish that the plan would not

have a retrogressive effect or that it was not motivated by a discriminatory intent because of: (a) the County's decision to not adopt a set of redistricting criteria so as "to avoid being held to a procedural or substantive standard of conduct"; (b) "the deliberate exclusion from meaningful involvement in key deliberations of the only member of the commissioners court elected from a minority ability-to-elect precinct"; and (c) the retrogressive impact of the last minute relocation of the largely White Bolivar Peninsula from Precinct 1 into Precinct 3, the only precinct in the County that provided minority citizens with the ability to elect a candidate of choice to office.

28.     With respect to the 2011 justice of the peace and constable plan, the Attorney General's March 5, 2012, letter informed County officials that "there is sufficient credible evidence that precludes the county from establishing, as it must under Section 5, that the reduction of the number of justice of the peace/constable districts as well as the redistricting plan to elect those officials will not have a retrogressive effect, and were not motivated by a discriminatory intent."

29.     Following the County's Section 5 submission to the Department, but prior to the Department's March 5, 2012, objection, two incumbent commissioners, two County justices of the peace, three County constables, and an individual voter filed a lawsuit in this Court seeking declaratory and injunctive relief to prevent the use of the enacted County redistricting plans in any election until the requisite Section 5 preclearance determinations had been obtained, and, if no Section 5 objection was interposed to either plan, a determination that the proposed commissioners court and/or justice of the peace and constable plans violated the Constitution and Section 2 of the Voting Rights Act.  *See* Complaint, *Petteway v. Galveston County*, 3:11-cv-00511, ECF No. 1 (S.D. Tex. Nov. 14, 2011).

30.    On January 20, 2012, a three-judge court issued a preliminary injunction under Section 5, prohibiting the County from implementing any of the plans then under review by the Department.  Order on Mot. For Reconsideration, *Petteway*, No. 3:11-cv-00511, ECF No. 45 (S.D. Tex. Jan. 20, 2012).

31.    On March 12, 2012, the County submitted a new commissioners court plan to the Attorney General for Section 5 review in which Precinct 3 remained a district in which Black and Hispanic voters had an ability to elect a candidate of choice.  The County also agreed that the benchmark 2001 justice of the peace and constable plan would govern the upcoming elections.

32.    On March 23, 2012, the Attorney General informed County officials that no objection under Section 5 would be interposed to the revised commissioners court plan.

33.    On March 23, 2012, this Court entered a final order enjoining the County from implementing any plans for the 2012 elections that had not been precleared under Section 5. Order, *Petteway*, No. 3:11-cv-00511, ECF No. 69 (S.D. Tex. Nov. 14, 2011).

34.    On August 19, 2013, less than two months following the Supreme Court's decision in *Shelby County v. Holder*, 571 U.S. 29 (2013), which rendered Section 5 inapplicable to the State of Texas and its political subdivisions, the commissioners court enacted a new redistricting plan that reduced the number of justice of the peace districts from eight to four and eliminated two of the three minority opportunity-to-elect districts.

35.    None of the other members of the commissioners court communicated with or otherwise involved Commissioner Holmes, the only commissioner elected from a minority opportunity-to-elect district, in the creation of this 2013 justice of the peace plan.

36.     The commissioners court posted the proposed justice of the peace plan on the County's website on August 16, 2013.  Three days later, on August 19, 2013, the plan was approved at a special session of the commissioners court with Defendant Henry, who was County Judge, and Commissioners Ryan Dennard, Kevin D. O'Brien, and Kenneth D. Clark voting in favor of the plan, and Commissioner Holmes voting against the plan.

37.     On August 26, 2013, two County justices of the peace, three County constables, and an individual voter filed a lawsuit challenging the newly-enacted justice of the peace plan pursuant to Section 2 of the Voting Rights Act, and the Fourteenth and Fifteenth Amendments of the Constitution.  *See* Complaint, *Petteway v. Galveston County*, 3:13-cv-00308, ECF No. 1 (S.D. Tex. Aug. 26, 2013).  Trial occurred in January 2014.  As of this date, a ruling has not been issued.

38.     The County did not adopt a new justice of the peace plan during the 2021 redistricting cycle.

### The 2021 Redistricting Process

39.     The same type of procedural and substantive deviations that led the Department of Justice to object in 2012 to the 2011 proposed commissioners court redistricting plan were also present during the County's 2021 redistricting process, including: (1) a history of proposing discriminatory redistricting plans; (2) a failure to adopt redistricting criteria; (3) the deliberate, ongoing exclusion of only the minority commissioner from the process; and (4) the dismantling of the only minority opportunity-to-elect district.

40.     On April 5, 2021, at a commissioners court meeting, the County began the post-2020 Census redistricting process by voting in favor of retaining outside redistricting counsel.  Commissioner Holmes voted against this hiring action.

41.     Publicly available meeting minutes and agendas contain no record of the commissioners court holding any meetings, executive sessions, workshops, or public hearings about the redistricting process or considering any proposed commissioners court plans between this April 5 meeting and a November 12, 2021, special session, during which the commissioners court voted to adopt the final commissioners court plan for the 2021 redistricting cycle.

42.     During prior redistricting cycles, the commissioners court set forth dates and times for public meetings across the County to give residents a clear timeline for consideration of proposed plans.

43.     Publicly available meeting minutes and agendas contain no record of any timelines concerning redistricting announced or issued by the County during the 2021 redistricting cycle.

44.     During the 1991 and 2001 redistricting cycles, the commissioners court adopted redistricting criteria or guidelines.

45.     During the 2021 redistricting process, the commissioners court failed to articulate or adopt any redistricting criteria.

46.     Commissioner Holmes, the commissioners court's only minority member, has stated that throughout the 2021 redistricting process, he was excluded from discussions with Defendant Henry and the other commissioners.

47.     During a September 23, 2021, meeting with the County's redistricting counsel, Commissioner Holmes provided the County's redistricting counsel with his views as to those changes to Precinct 3 that he believed to be necessary and appropriate.

48.     When the County's redistricting counsel subsequently presented Commissioner Holmes with two proposed plans, Map 1 and Map 2, both plans entirely ignored Commissioner Holmes's views and suggested changes to Precinct 3.

49.     Proposed Map 1 closely mirrors the geographic and demographic changes contained in the 2011 commissioners court plan to which the Attorney General interposed a Section 5 objection.  *See supra* ¶¶ 26-27.

50.     Proposed Map 2, which the commissioners court eventually adopted in 2021, shifts Precinct 3 north and inland to an area of the County where the population is predominately White.

51.     The changes to Precinct 3 in Map 2 result, in large part, from placing the Bolivar Peninsula and the City of Galveston in the same commissioners court precinct, an action that the County sought, but failed to accomplish in 2011 due to the Attorney General's objection.  *See supra id*.

52.     There are marked differences between the two areas.  The Bolivar Peninsula is an unincorporated area whose total population is 82.7% White, while in the City of Galveston, only 47.3% of the total population is White.  The County's website recommends the Peninsula for "fishing, boating, bird watching and spending a day on the beach!" whereas the City of Galveston's economy is primarily industrial and commercial with oil refineries, factories, and a major shipping industry.  *See Bolivar Peninsula*, County of Galveston, Tex. https://perma.cc/V5JB-53CD.

53.     Map 2 moved a substantial proportion of the Black and Hispanic voters in existing Precinct 3 into the three other commissioners court precincts.  The eastern part of League City, as well as the eastern part of the City of Dickinson moved to Precinct 1.  Most of

the Cities of La Marque, Santa Fe, and Hitchcock were shifted to Precinct 2.  In Texas City, the Carver Park neighborhood was split between Precincts 1 and 4.

54.    Map 2 also distributed virtually all of the voting precincts that had comprised existing commissioners court Precinct 3 to the other commissioner court precincts.  The extensiveness of this movement of voting locations is clear.  In the previous plan, commissioners court Precinct 3 had 26 voting precincts.  Only five of these voting precincts are retained in commissioners court Precinct 3 under Map 2.

55.    Map 2 also split voting precinct 336, which has the highest Black voting age population and percentage of Black voting age population in the County.  Although voting precinct 336 had been located in commissioners court Precinct 3 for over twenty years, the adopted plan moved the voting precinct out of Precinct 3 and split it between commissioners court Precincts 1 and 4.

56.    On October 29, 2021, the County posted images of the proposed plans, Map 1 and Map 2, to its website along with an online form for public comment.  The County did not include any additional information, such as demographic information, with the posted maps.

57.    The online form was the only opportunity for County residents to provide their views prior to the November 12, 2021, special session at which the commissioners court approved the final plan, *infra* ¶ 62.

58.    Commissioner Holmes was not included in several decisions regarding the formulation of the 2021 proposed plans.  For example, he has stated that he was not provided with a full set of underlying data for the proposed plans and was also excluded from the decision to post Map 1 and Map 2 on the County's website.

59.     During prior redistricting cycles, once proposed plans were created, they were made available for public review and comment.

60.     During prior redistricting cycles, the commissioners court held multiple public hearings that began at 6:00 p.m. or later.

61.     The public meetings that took place in prior redistricting cycles were held in multiple locations across the County, such as Bolivar, Galveston City, Santa Fe, Texas City, and League City.

62.     On November 12, 2021, two weeks after the proposed plans, Map 1 and Map 2, were posted on the County's website, the commissioners court held a special session to consider and vote on the proposed plans.

63.     The November 12, 2021, special session was the only public hearing on redistricting held during the 2021 redistricting cycle.

64.     The date, time, location, and structure of the November 12 special session further limited the opportunity for public participation.

65.     The commissioners court provided the public with only the statutorily required minimum notice of 72 hours prior to the November 12 special session.

66.     The commissioners court scheduled the November 12 special session on a Friday at 1:30 p.m., a time that conflicted with the work responsibilities of many members of the minority community.

67.      On November 1, 2021, the Texas Secretary of State issued an advisory noting among other things, that the dates of the State's 2022 primary and primary runoff elections were not changed and that the candidate filing period would proceed as set forth in Tex. Elec. Code § 172.023(a)-(b); that is, beginning on November 13 and ending on December 13.

68.     Defendants scheduled the special session on the last possible date that the commissioners court could approve a plan, thus precluding any opportunity to make any revisions in response to public comments received during the November 12 special session.

69.     The special session was held at the League City Annex Building, also known as the Calder Road Annex, rather than at the County Courthouse in the City of Galveston, where commissioners court meetings are typically held.

70.     The Calder Road Annex is near the Harris County border and approximately 25 miles away from the City of Galveston.

71.     At the Galveston County Courthouse, the meeting room can seat approximately 250 people, and the parking garage can fit approximately 400 to 500 vehicles.  Additional seating can be added.  There is also standing room along the walls, if necessary.

72.     The Galveston County Courthouse also has a sound system and each commissioner has a microphone at their seat.

73.     The Galveston County Courthouse location was available on November 12, 2021.

74.     The Calder Road Annex meeting room can only seat approximately 65 to 75 people.  Due to a construction project on site at the time of the November 12 special session, some of the location's 60 parking spaces were blocked off, and some of the entrances were closed.  There is no sound system, and no microphones were provided during the November 12 special session.

75.     There were approximately 150 to 200 people in attendance in the November 12 special session, but there was no overflow room.  The meeting room was full, and the halls were lined with members of the community, including elderly attendees using walkers and wheelchairs.

76.     The community members who were lined up in the hallways had trouble hearing what was being said, including if they were being called to speak.

77.     Defendant County Judge Henry started the special session by warning that constables were in the room and that he would have the constables remove the attendees who were stating that they could not hear him.

78.     Defendant Henry's decision to move the special session to the Calder Road Annex followed a similar decision by him in 2020 to hold a meeting at the Calder Road Annex regarding the removal of a Confederate statute on courthouse grounds.

79.     The video of the November 12 special session indicates that at least 40 attendees spoke, the majority of whom spoke in opposition to the commissioners court proposed plans, in general, and to the changes to Precinct 3, in particular.

80.     At the special session, Commissioner Holmes offered two alternative plans in which minority voters would retain an opportunity to elect their candidate of choice in Precinct 3.  None of the other commissioners present either moved to consider or to vote on either of Commissioner Holmes's alternative plans.

81.     During the special session, Commissioner Holmes also stated that "Precinct 3 is the only precinct in the county where minority voters have the ability to elect their candidate of choice, and is the only precinct currently represented by a minority commissioner.  So, you know this is the same playbook that happened in 2012."

82.     The commissioners court approved proposed Map 2 with a vote of 3-1. Defendant Henry and Commissioners Giusti and Apffel voted in favor, while Commissioner Holmes voted against Map 2.  Commissioner Clark was absent.

83.    During the special session, the proponents of the adopted plan did not provide any justification or rationale for the changes made to Precinct 3.

84.    On October 29, when proposed Map 1 and Map 2 were posted on the County's website for the first time, Defendant Henry expressed a desire for a single costal district in a social media post.  Following the adoption of the plan, in an interview, Commissioner Apffel stated that he voted for the map because Galveston Island and the Bolivar Peninsula should have a single representative because "the issues that the Gulf Coast faces are similar."

85.    Exhibit 3 depicts the 2021 adopted plan, and the tables below present the demographic data for the four commissioners court precincts in the 2021 adopted plan, according to the 2020 Census and the 2016-2020 ACS estimates.

**Galveston County Commissioners Court (Adopted November 12, 2021)**

| PCT. | TOTAL POPULATION | | | | DEV (%) | VOTING AGE POPULATION | | | |
|------|-------|----------------|----------------|---------------|---------|--------|----------------|----------------|---------------|
|      | TOTAL | NHWHITE (%) | NHBLACK (%) | HISP (%) |        | TOTAL  | NHWHITE (%) | NHBLACK (%) | HISP (%) |
| 1 | 87,689 | 48,169 (54.9) | 9,342 (10.7) | 24,445 (27.9) | 0.02 | 66,641 | 39,306 (59.0) | 6,613 (9.9) | 16,404 (24.6) |
| 2 | 87,697 | 47,460 (54.1) | 12,663 (14.4) | 22,725 (25.9) | 0.03 | 71,389 | 41,421 (58.0) | 9,511 (13.3) | 16,431 (23.0) |
| 3 | 88,111 | 50,534 (57.4) | 6,895 (7.8) | 22,573 (25.6) | 0.5 | 64,704 | 38,952 (60.2) | 4,959 (7.7) | 14,908 (23.0) |
| 4 | 87,185 | 45,195 (51.8) | 16,737 (19.2) | 18,893 (21.7) | -0.6 | 64,648 | 35,341 (54.7) | 12,258 (19.0) | 12,416 (19.2) |

| PCT. | CITIZEN VOTING AGE POPULATION ESTIMATES | | | | |
|------|-------|----------------|----------------|---------------|------------------------|
|      | TOTAL | NHWHITE (%) | NHBLACK (%) | HISP (%) | NHBLACK + HISP (%) |
| 1 | 62,357 | 38,990 (62.5) | 6,562 (10.5) | 13,070 (21.0) | 31.5 |
| 2 | 66,504 | 40,966 (61.6) | 9,374 (14.1) | 12,748 (19.2) | 33.3 |
| 3 | 59,710 | 38,111 (63.8) | 4,802 (8.0) | 11,606 (19.4) | 27.5 |
| 4 | 62,107 | 35,187 (56.7) | 12,120 (19.5) | 10,338 (16.7) | 36.2 |

86.    Since at least 1998, the County has never had a single coastal district.  Instead, Precinct 3 has always been comprised of the same general geographical area, and the Bolivar Peninsula has never been placed in the same precinct as the City of Galveston.

87.     Resolving the malapportionment under the previous plan did not require the creation of a single coastal district and the attendant dismantling of a Precinct 3 as a minority opportunity-to-elect district; instead, Defendants could have reapportioned the commissioners court plan by shifting as little as a single voting precinct from Precinct 2 to Precinct 3.

88.     Defendants, however, chose to adopt a plan that divides the Hispanic and Black citizen voting age populations in the County such that all four commissioners court precincts are comprised of an overwhelmingly majority-White citizen voting age population, and no commissioners court precinct provides Black and Hispanic voters with an equal opportunity to elect their preferred candidates of choice.

**The 2021 Commissioners Court Plan Will Have a Discriminatory Result**

89.     The 2021 commissioners court redistricting plan will result in denying or abridging the right of Black and Hispanic voters in Galveston County to participate equally in the political process.

90.     Black and Hispanic persons in Galveston County are sufficiently numerous and geographically compact to constitute a majority in one single member district out of four districts for the commissioners court.  It is possible to draw an illustrative districting plan in Galveston County in which Black and Hispanic persons constitute a majority of the citizens of voting age in one out of four commissioners court precincts under the 2020 Census and the 2016-2020 ACS estimates.  Indeed, it would have been straightforward in 2021 to revise the commissioners court precincts from the 2012 plan to maintain Precinct 3 as a district with a majority of Black and Hispanic citizens of voting age under the new census data.  Hence, the first precondition to a Section 2 claim under *Thornburg v. Gingles*, 478 U.S. 30 (1986) is satisfied.

91.     The census data estimates show that Black and Hispanic citizens are only 27.5% of the voting population in Precinct 3 of Galveston County's adopted 2021 commissioners court plan.  Under voting patterns prevalent in the County, minority voters will not have an equal opportunity to elect candidates of choice in Precinct 3 or in any other commissioners court precinct in the 2021 plan.

92.     Black and Hispanic voters in Galveston County are politically cohesive and have regularly voted for the same candidates in recent elections.  Hence, the second precondition to a Section 2 claim under *Gingles* is satisfied.

93.     Voting in Galveston County is racially polarized with non-Hispanic White voters lending minority-preferred candidates little crossover support.  Non-Hispanic White voters vote sufficiently as a bloc to usually defeat preferred candidates of minority voters in the absence of a majority-minority district.  Hence, the third precondition to a Section 2 claim under *Gingles* is satisfied.

94.     Facts relevant to the requisite totality of the circumstances inquiry are also present in Galveston County.

95.     Galveston County has been the site of official racial discrimination in voting and in the redistricting context.  Since 1976, Galveston County and the political subdivisions within it have been the subject of six Section 5 objection letters from the Department.[1]  These include objections to previous justice of the peace and constable and commissioners court redistricting plans, as described in *supra* ¶¶ 24, 26-27, as well as the use of at-large seats, the use of numbered posts for at-large seats, and majority-vote requirements for municipal offices.

---

[1] U.S. Dep't of Justice, *Voting Determination Letters for Texas*, (Aug. 7. 2015), *available at* https://perma.cc/YU2P-4QF9.

96.     The State of Texas, of which Galveston County is a subdivision, "has a long, well-documented history of discrimination that has touched upon the rights of African-Americans and Hispanics to register, to vote, or to participate otherwise in the electoral process." *Patino v. City of Pasadena*, 230 F. Supp. 3d 667, 682-83 (S.D. Tex. 2017) (quoting *LULAC v. Perry*, 548 U.S. 399, 439-40 (2006)); *see also, e.g.*, *Perez v. Abbott*, 253 F. Supp. 3d 864, 888, 906 (W.D. Tex. 2017).

97.     Galveston County has been the site of official racial discrimination outside the context of voting as well.

98.     In 2019, two White City of Galveston police officers on horseback led a Black man on a rope down a street after his arrest, leading to an apology from the police chief and a change in the police department's arrest policy.

99.     The City of Galveston continues to grapple with the aftermath of Hurricane Ike that significantly damaged the city's public housing complexes in 2008 and led to the demolition of 569 units in the complexes that sustained the most damage.  As of 2018, fewer than half of the public housing units have been rebuilt, a result that disproportionately affects the city's Black population.

100.    Both Hispanic and Black County residents continue to suffer the effects of past discrimination in areas such as education and employment that hinder their ability to participate effectively in the political process.

101.    According to the Census Bureau's 2016-2020 ACS 5-Year Estimates, 94.8% of White non-Hispanic County residents have at least a high school degree, compared to 87.7% of Black and 75.9% of Hispanic residents.

102.    The ACS data also estimate that 37.5% of White non-Hispanic County residents hold college degrees, compared to 22.1% of Black and 17.5% of Hispanic residents.

103.    The ACS data also estimate that 7.6% of White non-Hispanic County residents live below the poverty line, compared to 18.3% of Black and 15.8% of Hispanic residents.

104.    The mean per capita income for White non-Hispanic County residents is $45,465, compared to $26,006 for Black and $25,091 for Hispanic residents, according to ACS estimates.

105.    An estimated 9.1% of Black and 7% of Hispanic County residents are unemployed compared to just 4.8% of White non-Hispanic residents, according to ACS estimates.

106.    The level of political participation among Black and Hispanic voters is depressed in Galveston County with Black and Hispanic voters turning out at lower rates than White voters.

107.    Political campaigns in Galveston County have included racial appeals as recently as 2020.

108.    In a 2020 primary election for Galveston County tax assessor, a position that has no responsibilities related to immigration, a challenger to the incumbent sent out mailers featuring a photo of an alleged member of MS-13, an international criminal gang, complete with "a tattooed face and tattooed bare chest, standing arms crossed."  The text accompanying the photo stated that Texans can "thank" the incumbent "for having illegal immigrants vote in this November's election!"  According to news reports, the challenger "believe[d] the picture [to be] an accurate representation of what undocumented people in Galveston County look like."[2]

---

[2] John Wayne Ferguson, *Johnson: Peden ad 'racist,' 'discriminatory' and 'a lie,'* GALVESTON DAILY NEWS (Feb. 22, 2020), *available at* https://perma.cc/HA6V-CARG.

109.    Election results in Galveston County establish that, in the face of bloc voting by White residents, minority voters have an equal opportunity to elect a preferred candidate of choice only in districts in which they constitute a majority of the eligible voters.  As noted above, the electorate in Galveston County's prior versions of commissioners court Precinct 3, in which Black and Hispanic persons form a majority, has elected a minority county commissioner for over three decades.  In addition, there is only one other electorate in Galveston County, a district that elects a justice of the peace and a constable, in which Black and/or Hispanic residents are a majority.  That electorate has elected Black candidates into the positions of justice of the peace and constable, both of whom are the only other County officers who are members of a minority group.

110.    All of the 24 remaining elected offices in Galveston County are held by White officeholders.

### The 2021 Commissioners Court Plan Was Motivated, at Least in Part, by a Discriminatory Purpose

111.    The 2021 adopted plan was enacted, at least in part, with the purpose of denying or abridging the right of Black and Hispanic voters in Galveston County to vote on account of their race or color.

112.    The impact of the adopted plan will be to dilute minority voting strength in Galveston County by eliminating the equal opportunity to elect candidates of choice that minority voters previously enjoyed in Precinct 3.

113.    The history and sequence of events leading up to the adoption of the 2021 commissioners court plan provides additional evidence that discriminatory purpose was a factor in adoption of the plan.

114.     The history outlined above, *supra* ¶¶ 24-33, shows that Defendants have received repeated notice and have had clear knowledge that eliminating a majority-minority district will harm minority voters' opportunity to elect candidates of their choice.

115.     The County's 2021 redistricting process included a failure to adopt redistricting criteria, procedural and substantive departures from normal practice in the process, the deliberate exclusion of the lone minority commissioner from the process, and the elimination of the only district in which minority voters had an equal opportunity to elect candidates of choice.

116.     Although the County's redistricting timeline required adjustment due to the late release of 2020 Census data, the commissioners court engaged in a process that excluded the lone minority commissioner and was so abridged that it curtailed any opportunity for meaningful participation from the public.

117.     The overall record of the adoption process for the 2021 commissioners court redistricting plan suggests that the proffered rationale for the elimination of the minority-opportunity-to-elect district is pretextual.

## CAUSE OF ACTION

118.     The United States realleges and incorporates by reference the allegations set forth above.

119.     Section 2 of the Voting Rights Act establishes that "[n]o voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race[,] color, [or membership in a language minority group]."  52 U.S.C. § 10301(a).

120.    A violation of Section 2 "is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by [Section 2] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice."  52 U.S.C. § 10301(b).

121.    The 2021 Galveston County Commissioners Court plan has, at least in part, the purpose of denying or abridging the right to vote on account of race, color, or membership in a language minority group in violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301.

122.    The 2021 Galveston County Commissioners Court plan results in a denial or abridgement of the right of citizens of the United States to vote on account of race, color, or membership in a language minority group, in violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301.

123.    Unless enjoined by order of this Court, Defendants will continue to violate Section 2 by administering, implementing, and conducting elections for the Galveston County Commissioners Court using the 2021 plan.

**PRAYER FOR RELIEF**

WHEREFORE, the United States prays that the Court enter an order:

(1)    Declaring that the 2021 Galveston County Commissioners Court plan has the purpose of denying or abridging the right to vote on account of race, color, or membership in a language minority group in violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301;

(2)    Declaring that the 2021 Galveston County Commissioners Court plan results in a denial or abridgement of the right of citizens of the United States to vote on account of race,

color, or membership in a language minority group, in violation of Section 2 of the Voting

Rights Act, 52 U.S.C. § 10301;

(3)     Enjoining Defendants, their agents and successors in office, and all persons acting

in concert with Defendants from administering, implementing, or conducting any future elections

for the Galveston County Commissioners Court under the 2021 redistricting plan;

(4)     Ordering Defendants to devise and implement a permanent redistricting plan for

the Galveston County Commissioners Court that complies with Section 2 of the Voting Rights

Act;

(5)     Directing Defendants, their agents and successors in office, and all persons acting

in concert with Defendants to take appropriate action to ensure uniform compliance with this

Court's order by authorities administering the County's electoral processes; and

(6)     Granting such additional relief as the interests of justice may require.

Date:  March 24, 2022

JENNIFER B. LOWERY                              KRISTEN CLARKE
United States Attorney                               Assistant Attorney General
Southern District of Texas                          Civil Rights Division

                                                                PAMELA S. KARLAN
                                                                Principal Deputy Assistant General
                                                                Civil Rights Division

 /s/ Daniel D. Hu
DANIEL D. HU                                         T. CHRISTIAN HERREN, JR.
Civil Chief                                              ROBERT S. BERMAN
United States Attorney's Office                  CATHERINE MEZA
Southern District of Texas                          BRUCE I. GEAR
Attorney-in-Charge                                  THARUNI A. JAYARAMAN
Texas Bar No. 10131415                          ZACHARY J. NEWKIRK
SDTX ID: 7959                                        Attorneys, Voting Section
1000 Louisiana Ste. 2300                         Civil Rights Division
Houston, TX 77002                                  U.S. Department of Justice

713-567-9000 (telephone)                    950 Pennsylvania Avenue NW
713-718-3303 (fax)                          Washington, DC 20530
daniel.hu@usdoj.gov